UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X
UNITED STATES OF AMERICA,

       -against-                         <u>MEMORANDUM & ORDER</u>
                                          17-CR-0464(JS)
DANIELLE SINDZINGRE and
MURIEL BESCOND,

                         Defendants.
--------------------------------------X
APPEARANCES
For the United States
of America:              Matthew S. Amatruda, Esq.
                     United States Attorney's Office
                     Eastern District of New York
                     One Pierrepont Plaza
                     Brooklyn, NY 11201

                     Timothy A. Duree, Esq.
                     United States Department of Justice,
                     Criminal Division, Fraud Section
                     1400 New York Avenue
                     Washington, DC 20005

For Defendants
Danielle Sindzingre:     No appearance

Muriel Bescond:         Laurence S. Shtasel, Esq.
                     Blank Rome LLP
                     The Chrysler Building
                     One Logan Square
                     Philadelphia, PA 19103

                     Laurent Cohen-Tanugi, Esq.
                     Laurent Cohen-Tanugi Avocat
                     20, Boulevard Des Invalides
                     Paris, FR 75007

SEYBERT, District Judge:

       In August 2017, a grand jury returned a five-count indictment (the "Indictment") alleging that defendants Danielle Sindzingre ("Sindzingre") and Muriel Bescond ("Bescond" and

together, "Defendants") participated in a scheme to manipulate the London Interbank Offered Rate ("LIBOR") for the U.S. Dollar ("USD").  (See generally Indict., D.E. 1.)  Bescond moves to dismiss the Indictment on four grounds.  (Due Process Mot., D.E. 6; Selective Prosecution ("SP") Mot., D.E. 12; Extraterr. Br., D.E. 18.)  For the following reasons, Bescond's motions are DENIED.

BACKGROUND

I.   Factual Background[1]

   A.   LIBOR

        LIBOR is a benchmark interest rate that the British Bankers' Association ("BBA") administered during the relevant time.  (Indict. ¶ 9.)  LIBOR was calculated based on "Contributor Panel" banks' estimates of the rates at which they could borrow unsecured funds from other banks in ten currencies, including the USD, for fifteen different borrowing periods (called "maturities" or "tenors"), including a three-month maturity.  (Indict. ¶¶ 9-10.)  BBA rules required the Contributor Panel banks "to present an honest and unbiased estimate of [their] borrowing costs." (Indict. ¶ 10.)

        Each London business day, Contributor Panel banks sent their estimated interest rate submissions to Thomson Reuters, which acted as an agent for BBA.  (Indict. ¶ 10.)  For USD LIBOR,

---

[1] The following facts are drawn from the Indictment and are assumed to be true for purposes of this Memorandum and Order.

Thomson Reuters received submissions from sixteen Contributor Panel banks. (Indict. ¶ 10.) It excluded the four highest and four lowest submissions and averaged the remaining eight to determine the official USD LIBOR rate, or "fix." (Indict. ¶ 11.) Thomson Reuters transmitted each Contributor Panel bank's LIBOR submissions, as well as the final averaged LIBOR rates, to three data centers--including one located in New York--for worldwide publication. (Indict. ¶ 11.)

Published LIBOR rates were used to settle trades in a variety of financial instruments, including Eurodollar futures contracts. (Indict. ¶ 12.) "The term 'Eurodollar' refers to USDs on deposit in foreign banks for a fixed duration with a fixed yield." (Indict. ¶ 12.) Eurodollar futures contracts are LIBOR-based derivatives traded as commodities on the Chicago Mercantile Exchange ("CME") in Chicago, Illinois. (Indict. ¶ 12.) "[T]heir price reflected the predicted LIBOR at the end of the term of a three-month, $1,000,000 offshore deposit." (Indict. ¶ 12.) The contracts allow "investors to trade on their predictions of increases and decreases in LIBOR and enable purchasers to hedge financial risk." (Indict. ¶ 12.)

B.    Société Générale and Defendants

Société Générale, S.A. ("Société Générale" or the "Bank") is a financial institution and global financial services company headquartered in Paris, France, with a branch in New York,

New York.   (Indict. ¶ 1.)   Beginning February 2009, Société Générale was a member of the USD LIBOR Contributor Panel.   (Indict. ¶ 9.)

Sindzingre, a French citizen, was the Global Head of Treasury for Société Générale.   (Indict. ¶ 2.)   She oversaw the determination and submission of Société Générale's USD LIBOR rates.   (Indict. ¶ 15.)   Bescond, also a French citizen, served under Sindzingre as the head of the Bank's Paris treasury desk. (Indict. ¶¶ 3, 15.)   She supervised the "setters"--bank employees who prepared Société Générale's USD LIBOR submissions--and ensured that the Paris treasury desk carried out Sindzingre's directives. (Indict. ¶¶ 10, 15.)   "Manager-1" was the Head of Treasury at Société Générale's treasury desk in London.   (Indict. ¶ 4.) Manager-1, who reported directly to Sindzingre, was responsible for receiving USD LIBOR submissions from employees at the Paris treasury desk and sending them to Thomson Reuters.   (Indict. ¶ 16.) "Setter-1," "Setter-2," Setter-3," and "Setter-4" (collectively, the "Setters") were traders at the Bank's treasury desk in Paris. (Indict. ¶¶ 5-8.)

   C.   The Alleged Scheme

      In short, before May 2010, Société Générale made USD LIBOR submissions that were higher than those of many other members of the USD LIBOR Contributor Panel.   (Indict. ¶ 13.)   This indicated that Société Générale had to pay higher interest rates

than other banks to borrow money, which harmed its "reputation for financial soundness." (Indict. ¶¶ 13, 18.)  Between May 2010 and October 2011, Defendants, together with Manager-1, the Setters, and others, "engaged in a scheme to cause Société Générale to submit false and misleading USD LIBOR rates to the BBA via Thomson Reuters, so that it would appear to the public that Société Générale was able to borrow money at lower interest rates than the rates that were actually available to the Bank." (Indict. ¶ 14.) This scheme was designed "to avoid anticipated reputational harm to Société Générale had the Bank submitted honest estimates of its borrowing rates, which rates were publicized through the LIBOR rate setting process." (Indict. ¶ 14.)  The Bank's false and misleading submissions artificially reduced the USD LIBOR fix and affected millions of USD LIBOR-based financial transactions. (Indict. ¶ 14.)

According to the Indictment, the scheme developed as follows:  Outside analysts began to question the high level of Société Générale's LIBOR submissions.  (Indict. ¶ 17.)  By email on May 21, 2010, Sindzingre informed Bescond and others at the Paris treasury desk that she had met with members of Société Générale's General Directorate.  (Indict. ¶ 18.)  During the meeting, she had been required to discuss the fact that the Bank's high USD LIBOR submissions harmed its reputation for financial soundness.  (Indict. ¶ 18.)  Sindzingre instructed Bescond and her

staff to submit interest rate estimates that were lower than the
highest of the middle eight estimates--that is, lower than Société
Générale's actual estimated borrowing costs.  (Indict. ¶ 18.)

By email to Sindzingre on May 23, 2010, Bescond agreed
to do as Sindzingre ordered but cautioned that Société Générale's
submissions would be false.  (Indict. ¶ 19.)  Bescond carried out
Sindzingre's directive by instructing the Setters to make false
and misleading USD LIBOR submissions, which Manager-1 caused to be
sent to the BBA via Thomson Reuters.  (Indict. ¶ 19.)

On numerous occasions in the following months, Bescond,
Sindzingre, and others caused Société Générale to make false USD
LIBOR submissions that were lower than the rates that it paid to
borrow USDs.  (Indict. ¶ 20.)  For instance, on June 14, 2010,
they caused Société Générale to submit a three-month USD LIBOR
rate of 0.5525, when the interest rates at which the Bank borrowed
funds on that day ranged from 0.59 to 0.62.  (Indict. ¶ 20.)
Similarly, on June 15, 16, and 17, 2010, the three-month USD LIBOR
rates that Defendants and others caused the Bank to submit were
lower than the interest rates at which Société Générale borrowed
funds in the market.  (Indict. ¶¶ 21-22, 24.)

In June 2010, Sindzingre became concerned that the
Bank's manipulation of USD LIBOR could invite regulatory scrutiny.
(Indict. ¶ 23.)  By email on June 17, 2010, she advised her
superiors that Société Générale had been submitting USD LIBOR rates

that fell below the interest rates that the Bank was paying in the market.  (Indict. ¶ 23.)  She warned that the false submissions violated BBA rules and exposed Société Générale to accusations of market manipulation.  (Indict. ¶ 23.)  She suggested that the Bank begin to incrementally increase the rates it was submitting to accord with the actual rates at which Société Générale was borrowing money.  (Indict. ¶ 23.)

Notwithstanding Sindzingre's suggestion, the Bank--with the participation of Defendants--continued to make false and misleading USD LIBOR submissions that were below its actual borrowing costs.  (Indict. ¶ 25.)  For example, on June 22 and 28, 2010 and January 17, 2011, Defendants and others caused the Bank to submit three-month USD LIBOR rates that were lower than the rates at which Société Générale borrowed money in the market. (Indict. ¶¶ 26-28.)

By email on February 15, 2011, Sindzingre informed high-level Société Générale executives that the Bank's USD LIBOR submission was three to five basis points[2] below the accurate estimate of interest rates at which it could borrow funds. (Indict. ¶ 29.)  She repeated her suggestion that the Bank increase its LIBOR submissions to reflect its actual borrowing costs.

---

[2] Contributor Panel banks reported their USD LIBOR submissions to between two and five decimal places, with one one-hundredth of one percent (0.01 percent) referred to as one basis point. (Indict. ¶ 10.)

(Indict. ¶ 29.)  A day later, one of the executives responded that Société Générale should incrementally increase its submissions to reach the Bank's actual borrowing costs.  (Indict. ¶ 30.)

Despite this exchange, through at least October 2011, the Bank--with Defendants' knowing participation--continued to make false and misleading USD LIBOR submissions that were lower than its actual USD borrowing costs.  (Indict. ¶ 30.)  For instance, on October 26, 2011, Defendants and others caused Société Générale to submit a three-month USD LIBOR rate of 0.46 when the interest rates at which it borrowed funds on that day ranged from 0.75 to 1.27.  (Indict. ¶ 31.)

II.  Procedural History

The Indictment, which was filed on August 24, 2017, accuses Defendants of violating the Commodity Exchange Act ("CEA").  (Indict. ¶¶ 32-36.)  Specifically, it charges Defendants with conspiracy to transmit false, misleading, and knowingly inaccurate commodities reports in violation of 7 U.S.C. § 13(a)(2) and 18 U.S.C. § 371 (Count 1) and transmission of false, misleading, and knowingly inaccurate commodities reports in violation of 7 U.S.C. § 13(a)(2) and 18 U.S.C. § 2 (Counts 2-5). (Indict. ¶¶ 32-36.)

On August 24, 2017, Magistrate Judge Ramon E. Reyes, Jr. issued arrest warrants for both Defendants.  (See D.E. 2, 3.) Defendants are French citizens residing in France who have not

submitted to the Court's jurisdiction, and as a result, neither has been arraigned.

Despite her failure to appear, on May 23, 2018, Bescond moved through counsel to dismiss the Indictment on due process and statute of limitations grounds. (Due Process Mot.; Due Process Br., D.E. 6-1.) On June 29, 2018, the Government opposed the motion. (Gov't Due Process Opp., D.E. 10.) In its brief, the Government urges the Court to exercise its discretion under the fugitive disentitlement doctrine and not reach the merits of Bescond's motion, or alternatively, to deny her motion on the merits. (See generally Gov't Due Process Opp.) Bescond filed her reply on July 20, 2018. (Due Process Reply, D.E. 14.)

On July 6, 2018, before her first motion was fully briefed, Bescond filed another motion to dismiss the Indictment, this time on selective prosecution grounds. (SP Mot.; SP Br., D.E. 12-1.) In her brief, she contends that the Indictment should be dismissed because only she and Sindzingre--two females--were targeted by the Government, even though similarly situated males alleged to have been involved in the scheme could have been prosecuted. (See generally SP Br.) She argues that if the Court does not dismiss the Indictment outright, it should at a minimum allow her to take discovery on the issue of selective prosecution. (See generally SP Br.) On July 20, 2018, the Government filed its

opposition to the motion, (Gov't SP Opp., D.E. 15), and on July 27, 2018, Bescond filed a reply, (SP Reply, D.E. 16).

On December 17, 2018, this Court heard oral argument on both motions.  (See Min. Entry, D.E. 17.)  At oral argument, the Court requested additional briefing on whether the Indictment was timely returned under the applicable statute of limitations and whether the Indictment impermissibly sought to apply the CEA to extraterritorial conduct.  (See Min. Entry.)

On January 7, 2019, Bescond filed a brief arguing that the Indictment should be dismissed because it involves an extraterritorial application of the CEA.  (Extraterr. Br.)

On January 9, 2019, the Government filed a brief regarding the statute of limitations, (Gov't Statute of Limitations ("SOL") Opp., D.E. 20), to which Bescond responded on January 25, 2019, (SOL Reply, D.E. 23).  Bescond maintains that while the Government provided tolling orders to support its position, those tolling orders, without more, do not establish that the Indictment was timely returned.  (See generally SOL Reply.)

To summarize, Bescond contends that she is not a fugitive and that the Court should reach the merits of her motions despite her absence.  As to the merits, she argues that the Court should dismiss the Indictment because (1) it charges her with extraterritorial violations of the CEA; (2) it is inconsistent

10

with due process; (3) the Government has not met its burden to show that the Indictment was returned within the statute of limitations; and (4) the Government has engaged in selective prosecution by charging only female participants in the alleged scheme to manipulate USD LIBOR.  Alternatively, she argues that the Court should order discovery on her selective prosecution claim and that more information from the Government is required to determine whether the Indictment was timely returned.

DISCUSSION

I.   Fugitive Disentitlement Doctrine

At the outset, the parties dispute whether the Court should apply the fugitive disentitlement doctrine and decline to reach the merits of Bescond's motions.  The Government contends that Bescond "is a fugitive who has chosen to avoid the reach of this Court by remaining in France" and that the Court should refuse to consider her motions.  (Gov't Due Process Opp. at 3-9.)  Bescond maintains that she is entitled to challenge the Indictment notwithstanding her absence from the country.  (Due Process Br. at 5-8; Due Process Reply at 1-11.)

"[T]he fugitive disentitlement doctrine is 'an equitable doctrine that may be applied at court discretion' barring fugitives from seeking judicial relief."  United States v. Hayes, 118 F. Supp. 3d 620, 624 (S.D.N.Y. 2015) (internal quotation marks omitted) (quoting Hanson v. Phillips, 442 F.3d 789, 795 (2d Cir.

11

2006)), appeal dismissed and mandamus petition denied, 2d Cir. Case Nos. 15-2597, 15-3896. "As its name suggests, the fugitive disentitlement doctrine 'disentitles [a] defendant to call upon the resources of the Court for determination of his claims' while he remains a fugitive." United States v. Miller, 166 F. Supp. 3d 346, 348 (W.D.N.Y. 2016) (alteration in original) (quoting Molinaro v. New Jersey, 396 U.S. 365, 366, 90 S. Ct. 498, 24 L. Ed. 2d 586 (1970) (per curiam)). "While the 'paradigmatic object of the doctrine is the convicted criminal who flees while his appeal is pending,' it applies to defendants that evade the authority of the justice system at any stage of the criminal process." Hayes, 118 F. Supp. 3d at 624 (quoting Gao v. Gonzales, 481 F.3d 173, 175 (2d Cir. 2007)) (citing United States v. Buck, No. 13-CR-0282, 2015 WL 195872 (S.D.N.Y. Jan. 9, 2015)). Thus, trial courts may apply the doctrine and "decline[ ] to consider the merits" of a motion to dismiss a charging instrument. Hayes, 118 F. Supp. 3d at 627.

Before applying the fugitive disentitlement doctrine, the court must resolve the "threshold question of whether the defendant is a 'fugitive.'" Id. at 624. Next, the court must decide whether to bar the fugitive from seeking relief in view of the "four independent justifications for disentitlement: (1) assuring the enforceability of a decision against a fugitive; (2) imposing a penalty for flouting the judicial process;

(3) discouraging flights from justice to promote efficient operation of the courts; and (4) avoiding prejudice to the other side engendered by a defendant's flight." Hanson, 442 F.3d at 795 (citing Bar-Levy v. U.S. Dep't of Justice, 990 F.2d 33, 35 (2d Cir. 1993)).  The Court will consider each issue in turn.

    A.   Whether Bescond is a Fugitive

      "The first question is a thorny one." United States v. Hayes, 99 F. Supp. 3d 409, 415 (S.D.N.Y. 2015) (citations omitted), R&R adopted in part, 118 F. Supp. 3d 620.  As relevant here, the Second Circuit has recognized three categories of fugitives--two varieties of common-law fugitives and one group whose disentitlement may be ordered pursuant to statute in civil forfeiture cases.  See Collazos v. United States, 368 F.3d 190, 198-200 (2d Cir. 2004).  Discussing common-law fugitives, the Second Circuit noted that "[a] fugitive from justice has been defined as '[a] person who, having committed a crime, flees from [the] jurisdiction of [the] court where [a] crime was committed or departs from his usual place of abode and conceals himself within the district.'" Id. at 195-96 (alterations in original) (internal quotation marks omitted) (quoting Empire Blue Cross & Blue Shield v. Finkelstein, 111 F.3d 278, 281 (2d Cir. 1997)).  This definition encompasses the first category of "traditional common-law fugitives, specifically, persons who allegedly committed crimes

while in the United States and who, upon learning that their arrest was sought, fled the country." Id. at 198-99.

The second category of common-law fugitive is premised on "constructive flight" from the jurisdiction. Hayes, 118 F. Supp. 3d at 624-25 (citation omitted). This group includes "persons who allegedly committed crimes while in the United States but who were outside the country--for whatever reason--when they learned that their arrests were sought and who then refused to return to the United States in order to avoid prosecution." Collazos, 368 F.3d at 199 (citations omitted).

As to the third category, in civil forfeiture actions, federal courts have authority under 28 U.S.C. § 2466 to order the disentitlement of would-be litigants who otherwise fall within the statute's reach and "decline to 'enter' the United States' jurisdiction." Collazos, 368 F.3d at 198-99; see 28 U.S.C. § 2466.[3] Examining this statute, the Second Circuit

---

[3] In relevant part, 28 U.S.C. § 2466, entitled "Fugitive disentitlement," provides:

> (a) A judicial officer may disallow a person from using the resources of the courts of the United States in furtherance of a claim in any related civil forfeiture action or a claim in third party proceedings in any related criminal forfeiture action upon a finding that such person--
>
>> (1) after notice or knowledge of the fact that a warrant or process has been issued for his apprehension, in order to avoid criminal prosecution--

observed that Congress' use of "enter" (in addition to "reenter") "extends disentitlement authority beyond common-law fugitives, who may have been in the United States at the time they committed the charged crimes and who refuse to return, to persons who, although they may have never set foot within the territorial jurisdiction of the United States, know that warrants are outstanding for them and, as a result, refuse to enter the country."  Id. at 199-200.

Bescond is a French citizen living in France--a country that the parties agree does not currently extradite its citizens--and there is no allegation that she was present in the United States when she engaged in the alleged criminal activity.[4]  (Gov't Due Process Opp. at 2, 5-6; Due Process Reply at 9.)  The Government

_____

(A) purposely leaves the jurisdiction of the United States;

(B) declines to enter or reenter the United States to submit to its jurisdiction; or

(C) otherwise evades the jurisdiction of the court in which a criminal case is pending against the person; and

(2) is not confined or held in custody in any other jurisdiction for commission of criminal conduct in that jurisdiction.

28 U.S.C. § 2466.

[4] Bescond provides that she traveled to the United States in 2008, 2009, 2012, and 2014, but that "[n]one of these brief trips occurred during the time period relevant to the Indictment and the crimes alleged therein."  (Due Process Br. at 4.)

argues that she nonetheless qualifies as a "fugitive" because she has "declined to come to the United States upon learning of the criminal charges." (Gov't Due Process Opp. at 6.) Bescond responds that she could qualify as a "fugitive" under only the definition supplied by the inapplicable civil forfeiture provision. (Due Process Reply at 3-8.)

There is no dispute that if this were a civil forfeiture action related to Bescond's criminal case, disentitlement would be allowed: Bescond is not confined in another jurisdiction, yet she has avoided prosecution by declining to enter the United States after learning that a warrant has issued for her arrest. See 28 U.S.C. § 2466(a); Collazos, 368 F.3d at 198-200. On the other hand, as the Second Circuit outlined the groups in Collazos, Bescond does not easily fit within either category of common-law fugitive because she was not physically present in the United States at the time of her alleged criminal conduct. Collazos, 368 F.3d at 198-99. The question is whether to extend common-law fugitive status to defendants like Bescond, as other courts have done in decisions highlighted by the Government. (Gov't Due Process Opp. at 5-7 (citing United States v. Hayes, 118 F. Supp. 3d 620 (S.D.N.Y. 2015) and United States v. Miller, 166 F. Supp. 3d 346 (W.D.N.Y. 2016)).)

In United States v. Hayes, Judge Crotty of the Southern District of New York observed that the "[t]he connection between

16

'flight' [from the jurisdiction] and 'fugitive status' is best understood when one considers that most federal crimes are committed by defendants who are physically located in the United States." Hayes, 118 F. Supp. 3d at 625. In those cases, defendants can flee "before, during, or after the prosecution commences, becoming fugitives." Id. However, a significant number of crimes can be committed by those who were never physically present in the United States--"[f]or example, a defendant can conspire to commit wire fraud . . . based entirely on actions taken abroad that use United States wires." Id. In these cases, defendants who are alleged to have "violated United States law from afar neither have the capacity nor incentive to flee the United States." Id. Judge Crotty reasoned that such defendants should not be able to avoid the designation of "fugitive" simply because they committed their crimes while abroad. See id.; see also United States v. Hernandez, No. 09-CR-0625, 2010 WL 2652495, at *5 (S.D.N.Y. June 30, 2010) ("[H]ow the person became a 'fugitive' is not necessarily relevant because the focus is on the intent to return and appear before the court.").

Judge Crotty noted that Congress avoided this "anomaly" in civil forfeiture cases "by explicitly extending the fugitive disentitlement doctrine beyond common-law fugitives." Hayes, 118 F. Supp. 3d at 625. Considering the civil forfeiture statute and

17

that "[c]ourts, too, have expanded the definition of 'fugitive'
outside of the civil forfeiture setting," he concluded:

> [T]he definition of a "fugitive" should take
> account of the realities of modern criminal
> prosecutions, coping with the strains of
> globalization.  The Court cannot be bound by
> the semantics that limit fugitive status to
> fleeing or failing to return when dealing with
> an international criminal defendant who
> allegedly violated United States law from
> abroad.  Instead, the Court considers the
> real-world implication of the Government's
> allegations: [the defendant] allegedly
> violated United States law; a warrant for
> [his] arrest was issued by [a] Magistrate
> Judge [ ]; [the defendant] would be arrested
> if he entered the United States (or if he left
> Switzerland); and [he] has avoided arrest by
> remaining in Switzerland.  That [he] did not
> flee the United States should not preclude him
> from being labeled a fugitive as a matter of
> law.

Id. at 626.

In United States v. Miller, Judge Arcara of the Western
District of New York found that the defendant, who was living in
Nicaragua and "chose not to return to the United States once he
was indicted," was a "fugitive."  Miller, 166 F. Supp. 3d at 348.
Judge Arcara reasoned that whether the defendant fled from the
jurisdiction or chose not to return to the United States after he
was indicted was "a meaningless distinction.  The primary purpose
of the fugitive disentitlement doctrine--promoting mutuality of
litigation--is served both when a defendant flees the United States
and when he chooses to remain outside the United States."  Id.;

18

see also Buck, 2015 WL 195872, at *2 (noting that "[a] defendant who knowingly fails to appear for an arraignment is a fugitive" and applying the fugitive disentitlement doctrine to a Swiss defendant who was briefly in the United States and who was alleged to have committed most of his criminal acts while in Switzerland).

Additionally, the Sixth Circuit recently dismissed a defendant's appeal and denied his petition for a writ of mandamus after a district court deemed him a fugitive and held his motion to dismiss his indictment in abeyance until he appeared in court. United States v. Martirossian, 917 F.3d 883, 886 (6th Cir. 2019). The defendant, an Armenian citizen residing in China, claimed to have never traveled to the United States.   Id. at 886, 888. Regardless, the Sixth Circuit noted that "a defendant need not be present in and leave a jurisdiction to become a fugitive; the mere refusal to report for prosecution can constitute constructive flight."   Id. at 890 (citing United States v. Shalhoub, 855 F.3d 1255, 1263 (11th Cir. 2017)).   Thus, it declined to order the district court to rule on his motion.   Id. at 886.

The Court finds the above decisions to be persuasive and concludes that Bescond is a fugitive.[5]   "[Bescond] allegedly

---

[5] Bescond warns that if she were to be considered a fugitive in these circumstances, the "decision would completely nullify Constitutional protections . . . . and permit the government to insulate from Constitutional challenge any indictment of a foreign citizen living abroad unless the defendant left her home, employment and family; traveled to the United States; and

19

violated United States law; a warrant for [Bescond's] arrest was issued by Magistrate Judge [Reyes]; [Bescond] would be arrested if [s]he entered the United States (or if [s]he left [France]); and [Bescond] has avoided arrest by remaining in [France].  That [Bescond] did not flee the United States should not preclude [her] from being labeled a fugitive as a matter of law." See Hayes, 118 F. Supp. 3d at 626; see also Shalhoub, 855 F.3d at 1263 (citation omitted) ("But whether [the defendant] was in Saudi Arabia when the grand jury indicted him is beside the point. . . .  [The defendant] knew of the indictment and 'refused to surrender himself to th[e] jurisdiction of the court,' electing instead not to travel outside of Saudi Arabia to avoid apprehension.  The district court did not clearly abuse its discretion when it applied the doctrine of constructive flight to [the defendant].") (third alteration in original); In re Kashamu, 769 F.3d 490, 493-94 (7th Cir. 2014) ("It's true that [the defendant] didn't literally flee the United States, since he was never in the United States.  But he knew he was under indictment in this country, yet rather than come here to

_____

voluntarily submitted to lengthy detention.  This is an unlawful construct that would only invite abuse."  (Due Process Reply at 7-8.)  This argument is unconvincing.  The fugitive disentitlement doctrine is not jurisdictional, but may be applied at a court's discretion.  Hayes, 118 F. Supp. 3d at 624 & n.3 (citations omitted).  Were a court to identify any abuse or prosecutorial overreaching, it could decline to apply disentitlement and reach the merits of a defendant's motion even if the defendant could be classified as a fugitive.

fight the validity of the government's charges, he fought tooth and nail (and successfully) to prevent his being extradited from the United Kingdom to the United States. He . . . was functionally a fugitive . . . .") (second alteration in original).  Thus, the Court must consider the justifications for fugitive disentitlement to determine whether to apply the doctrine here.

    B.   Whether the Court Should Apply the Fugitive
         Disentitlement Doctrine

         As discussed, the fugitive disentitlement doctrine serves four independent purposes: "(1) assuring the enforceability of a decision against a fugitive; (2) imposing a penalty for flouting the judicial process; (3) discouraging flights from justice to promote efficient operation of the courts; and (4) avoiding prejudice to the other side engendered by a defendant's flight."  Hanson, 442 F.3d at 795 (citing Bar-Levy, 990 F.2d at 35).  The Court finds that each justification for the doctrine favors its application to Bescond.  "Indeed, the doctrine exists precisely to guard against defendants, like [Bescond], that 'attempt[ ] to invoke from a safe distance only so much of a United States court's jurisdiction as might secure [her] [a dismissal] while carefully shielding h[er]self from the possibility of a penal sanction.'"  Hayes, 118 F. Supp. 3d at 626 (second and fourth alterations in original) (quoting Collazos, 368 F.3d at 200).

First, Bescond seeks to engage in one-sided litigation, asking for relief from the Court when an unfavorable decision would not be enforceable in her absence.  She would welcome a favorable ruling on her motions and the resulting dismissal of the Indictment or Court order for the Government to provide her with information that she hopes will support her defenses.  On the other hand, an unfavorable ruling would not be enforceable since she is not present in the jurisdiction and has indicated no willingness to submit to the Court's jurisdiction if her motions are unsuccessful.[6]  In these circumstances, the litigation clearly lacks "mutuality."[7]  See Hayes, 118 F. Supp. 3d at 626-27.  Bescond "is not entitled to receive any potentially favorable rulings from

---

[6] Bescond has not contested the Government's assertion that "Defense counsel has repeatedly suggested to the government that Defendant does not intend to travel to the United States to have the case against her adjudicated."  (Gov't Due Process Opp. at 8.)

[7] Bescond argues that the Indictment itself imposes burdens sufficient to establish mutuality--for instance, she avers that it damages her reputation, that it "effectively impos[es] an indefinite travel ban upon her unless she is willing to face arraignment and detainment in this country (potentially for years)," and that "there is no guarantee that" France will not change its current policy to not extradite its citizens.  (Due Process Reply at 8-9.)  The Court disagrees; these burdens "are typical for fugitives and cannot outweigh the competing benefit of being able to live freely in [France]."  See Hayes, 118 F. Supp. 3d at 627; Martirossian, 917 F.3d at 890 ("That the status quo leaves [the defendant] with risks of extradition or limits on his travel is true.  But the same is true for a criminal defendant who is charged with a crime in one State of this country and refuses to make an appearance in that State's courts.").

22

this Court if [s]he is unwilling to stand for and face the consequences of any potentially unfavorable rulings." See Buck, 2015 WL 195872, at *3.

Second, Bescond is flouting the judicial process. The Court agrees with her argument that her "mere absence from [the] proceeding is not tantamount to 'flouting' it." (Due Process Reply at 10.)  But her absence, combined with her counsel's appearance, her request for dismissal, her alternative request for more information so that she can continue to litigate this case from afar, and her apparent unwillingness to submit to the Court's jurisdiction should it not rule in her favor, is "the very essence of flouting the judicial process." See Hayes, 118 F. Supp. 3d at 627 (citing Buck, 2015 WL 195872, at *3).

Third, ruling on the merits of Bescond's motions would condone the practice of attacking indictments from abroad while refusing to adhere to unfavorable rulings.  "If the Court were to permit [Bescond] to move to dismiss the [Indictment] without submitting to the Court's jurisdiction, it would enable any defendant located outside the United States to do likewise.  This would eradicate any incentive for a foreign defendant to comply with an arrest warrant, submit to a court's jurisdiction, and respond to the Government's allegations while enjoying the constitutional protections afforded to criminal defendants." Id.

Fourth, Bescond's failure to appear prejudices the Government's ability to locate witnesses and present evidence at trial.  See Hanson, 442 F.3d at 796.  As the Government points out, it "cannot proceed with its case until [Bescond] appears in the Eastern District of New York." (Gov't Due Process Opp. at 9).

In sum, the Court concludes that Bescond is a fugitive and that the justifications for the fugitive disentitlement doctrine support its application here.  Accordingly, the Court declines to reach the merits of her motions, order discovery on her selective prosecution claim, or order the Government to provide additional information and briefing on Bescond's statute of limitations defense.

## II.  Bescond's Motions Regarding Extraterritorial Application of the CEA and Due Process also Fail on the Merits

### A.  Alternative Ruling

As Bescond acknowledges, even if the Court were inclined to rule on her motions, it would require additional briefing and information on her selective prosecution and statute of limitations arguments.  (E.g., SOL Reply at 4-5 & n.5 ("[T]he government would need to produce for inspection the ex parte submissions by the government to obtain the tolling orders, the requests made to foreign authorities, the responses to these requests, and all evidence of 'final action.'"); SP Br. at 14 ("[T]he burden [shifts] to the government to justify what appears

24

to be patent gender discrimination . . . .  At a minimum, Mme. Bescond should be permitted to conduct discovery into how and why the government chose to single out only female participants for prosecution given that similarly situated males were excluded altogether."); Argument Tr., SOL Reply Ex. 1., D.E. 23-1, 12:24-13:24, 41:5-13.)  For the reasons discussed above, the Court will not order the Government to provide that information unless Bescond submits to the Court's jurisdiction (at which time a Court order would likely be unnecessary).

However, at this stage, the Court does not require any additional information to resolve the other two grounds for Bescond's motions--whether the CEA is being applied extraterritorially and whether the prosecution is consistent with due process.  Considering this fact, the Court must decide whether to include an alternative ruling on these grounds to provide the Second Circuit with a complete record on review.

In In re Hijazi, the Seventh Circuit found that the fugitive disentitlement doctrine did not preclude a ruling on motions to dismiss an indictment filed by an absent, foreign defendant who had not fled the United States.  In re Hijazi, 589 F.3d 401, 412-13 (7th Cir. 2009).  It issued a writ of mandamus ordering the district court to rule on those motions.  Id. at 409-10, 414.  This Court finds In re Hijazi to be distinguishable because when Hijazi, a Lebanese citizen, "learned of the

indictment, he surrendered himself to the Kuwaiti authorities. Had those authorities been inclined to detain him and then to turn him over to the U.S. prosecutors, they could have done so.  Or they could have prosecuted him under Kuwaiti law." Id. at 403, 412-13.  Here, in contrast, there is no indication that Bescond surrendered herself to French authorities.  See Martirossian, 917 F.3d at 890 (distinguishing In re Hijazi on this ground). Additionally, while Bescond would risk apprehension and extradition if she were to leave France, as Hijazi would have had he left Kuwait, Hijazi bore a greater burden because Lebanon--not Kuwait--was his native country and where his family lived.  In re Hijazi at 407, 413.  Bescond's burden is lighter because she is confined to France, the country of her citizenship and where her family resides.  (See Due Process Reply at 8.)

More recently, the Sixth Circuit declined to order a district court to rule on a motion to dismiss filed by an absent defendant in circumstances like Bescond's.  It explained that "[i]f [the defendant] needs the district court to decide his motion, this international businessman holds the key to unlock his dilemma: travel to Ohio and answer the charges or at least commit to accept the consequences, good or bad, of the ruling." Martirossian, 917 F.3d at 887-88; see In re Kashamu, 769 F.3d at 494 ("If [the defendant] wants to fight the charges, he has only to fly from Lagos to Chicago; there are loads of reasonably priced flights.").

While the Court agrees with Martirossian's analysis, the Court cannot locate a Second Circuit opinion either condoning or condemning the application of fugitive disentitlement to a defendant like Bescond.    Therefore, the Court includes the following alternative holding on the fully briefed grounds for her motion.    See United States v. Hayes, 2d Cir. Case No. 15-2597, D.E. 73, and In re Roger Darin, 2d Cir. Case No. 15-3896, D.E. 24 (dismissing appeal for lack of appellate jurisdiction and denying mandamus petition for failure to demonstrate exceptional circumstances warranting relief where district court denied motion to dismiss the absent defendant's indictment pursuant to fugitive disentitlement doctrine, and alternatively, on the merits).

B.    Whether the Indictment Alleges a Domestic or Extraterritorial Application of the CEA

Bescond argues that the CEA is not intended to apply extraterritorially--"that is, to events occurring and injuries suffered outside the United States"--but that the Indictment seeks to apply the statute to actions she is accused to have taken while living and working in France.    (Extraterr. Br. at 3-7); see RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2096, 195 L. Ed. 2d 476 (2016).    Therefore, she contends, the Indictment should be dismissed as impermissibly extraterritorial.    (Extraterr. Br. at 6-7.)

The Government asserts that the Indictment does not charge Bescond with extraterritorial violations of CEA Section 9(a)(2), 7 U.S.C. § 13(a)(2).[8]  (Gov't Due Process Opp. at 9-16.) According to the Government, the Indictment accuses her of "caus[ing] false market information to be transmitted into the United States, and this information affected the price of futures contracts, including Eurodollar futures, which are priced based on LIBOR and which trade on the [CME]."  (Gov't Due Process Opp. at 15.)  Therefore, it concludes, "the charges against [Bescond] constitute a domestic application of the relevant statute."  (Gov't Due Process Opp. at 16.)

In RJR Nabisco, Inc. v. European Community, the Supreme Court discussed the "canon of statutory construction known as the presumption against extraterritoriality:  Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application."  136 S. Ct. at 2100 (quoting Morrison, 561 U.S. at 255, 130 S. Ct. at 2877).  It

---

[8] The Government does not argue that Section 9(a)(2) of the CEA may be applied extraterritorially.  (Gov't Due Process Opp. at 10-11 & n.3); see In re LIBOR-Based Fin. Instruments Antitrust Litig., 935 F. Supp. 2d 666, 696 (S.D.N.Y. 2013) ("LIBOR I") (quoting Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247, 255, 130 S. Ct. 2869, 2878, 177 L. Ed. 2d 535 (2010)) ("Because section 9(a) of the CEA 'gives no clear indication of an extraterritorial application, it has none.'"), vacated and remanded on other grounds sub nom. Gelboim v. Bank of Am. Corp., 823 F.3d 759 (2d Cir. 2016).

detailed "a two-step framework for analyzing extraterritoriality issues." Id. at 2101.

> At the first step, we ask whether the presumption against extraterritoriality has been rebutted--that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially. . . . If the statute is not extraterritorial, then at the second step we determine whether the case involves a domestic application of the statute, and we do this by looking to the statute's "focus." If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.

Id.

Given the parties' arguments, the Court begins its analysis at the second step and examines whether the Indictment accuses Bescond of domestic or extraterritorial violations of the CEA. To do this, the Court must determine "the 'focus' of congressional concern" of CEA Section 9(a)(2). Morrison, 561 U.S. at 266-67, 130 S. Ct. at 2884 (citations omitted). "The focus of a statute is 'the objec[t] of [its] solicitude,' which can include the conduct it 'seeks to regulate,' as well as the parties and interests it 'seeks to protec[t]' or vindicate." WesternGeco LLC v. ION Geophysical Corp., 138 S. Ct. 2129, 2136, 201 L. Ed. 2d 584

(2018) (alterations in original) (internal quotation marks omitted) (quoting Morrison, 561 U.S. at 267, 130 S. Ct. at 2884).

The purpose of the CEA is to, among other things, "deter and prevent price manipulation or any other disruptions to market integrity [and] to ensure the financial integrity" of commodities and futures transactions.  7 U.S.C. § 5(b).  It "is a 'remedial statute that serves the crucial purpose of protecting the innocent individual investor--who may know little about the intricacies and complexities of the commodities market--from being misled or deceived.'"  Loginovskaya v. Batratchenko, 764 F.3d 266, 270 (2d Cir. 2014) (quoting Commodity Futures Trading Comm'n v. R.J. Fitzgerald & Co., 310 F.3d 1321, 1329 (11th Cir. 2002)).  Like the Securities Exchange Act, the CEA "is primarily concerned[ ] not with the place where the deception originates, but with the regulation of [commodities and futures contracts] listed on domestic exchanges."[9]  U.S. Commodity Futures Trading Comm'n v. Garofalo, No. 10-CV-2417, 2010 WL 11245430, at *5-6 (N.D. Ill. Dec. 21, 2010) (citing Morrison, 561 U.S. at 267, 130 S. Ct. at 2886); see Loginovskaya, 764 F.3d at 272-75 (quoting Absolute Activist Value Master Fund Ltd. v. Ficeto, 677 F.3d 60, 70 (2d

_____

[9] But see Myun-Uk Choi v. Tower Research Capital LLC, 890 F.3d 60 (2d Cir. 2018), where the Second Circuit noted that it "never concluded . . . that Morrison's 'domestic exchange' prong applies to the CEA either to broaden or to narrow its extraterritorial reach."  Id. at 66-67.

Cir. 2012)) (applying Morrison and Absolute Activist to Section 22
of the CEA, concluding in light of Section 22's focus that relevant
transaction must be located in United States, and remarking that
"'a party's residency or citizenship is irrelevant to the location
of a given transaction'").

Analyzing the manipulation subdivision of Section
9(a)(2), which prohibits the "manipulat[ion] or attempt[ed] [ ]
manipulat[ion of] the price of any commodity in interstate
commerce, or for future delivery on or subject to the rules of any
registered entity," 7 U.S.C. § 13(a)(2), Judge Buchwald of the
Southern District of New York found that the subsection's focus is
"on commodities in interstate commerce and futures contracts
traded on domestic exchanges." LIBOR I, 935 F. Supp. 2d at 696.
Thus, she concluded, "a claim is within the CEA's domestic
application if it involves (1) commodities in interstate commerce
or (2) futures contracts traded on domestic exchanges.'" Id.

The Indictment accuses Bescond of violating the false
reporting subsection of Section 9(a)(2), which prohibits any
person from "knowingly [ ] deliver[ing] or caus[ing] to be
delivered for transmission through the mails or interstate
commerce by telegraph, telephone, wireless, or other means of
communication false or misleading or knowingly inaccurate reports
concerning . . . market information or conditions that affect or

31

tend to affect the price of any commodity in interstate commerce."[10]
7 U.S.C. § 13(a)(2).  Notably, it proscribes the transmission of
only those false reports "that affect or tend to affect the price
of any commodity in interstate commerce." Id.; see Morrison, 561
U.S. at 266, 130 S. Ct. at 2884 (quoting 15 U.S.C. § 78j(b))
("Section 10(b) does not punish deceptive conduct, but only
deceptive conduct 'in connection with the purchase or sale of any
security registered on a national securities exchange or any
security not so registered.'").  Considering this language, the
CEA's overarching purpose, and the manipulation subsection's
focus, the Court concludes that the false reporting subsection's
focus--"'the object[t] of [its] solicitude'"--is any commodity in
interstate commerce.  See WesternGeco LLC, 138 S. Ct. at 2137
(alterations in original) (quoting Morrison, 561 U.S. at 267, 130
S. Ct. at 2884).  The domestic "conduct relevant to [that] focus"
is the manipulation of the price of any commodity bought or sold
in the United States, regardless of the location from which a
defendant causes a false report to be transmitted in or into the
United States.[11]  See RJR Nabisco, Inc., 136 S. Ct. at 2101; United

---

[10] Of course, the private-right-of-action restrictions of CEA
Section 22 do not constrain the Government.  See Loginovskaya,
764 F.3d at 273.

[11] Section 9(a)(2) of the CEA refers to the transmission of a
false report "through the mails or interstate commerce."
7 U.S.C. § 13(a)(2).  The CEA defines "interstate commerce" to
include commerce "between any State, territory, or possession,

States v. Gasperini, 729 F. App'x 112, 114 (2d Cir. 2018) (finding domestic application of Computer Fraud and Abuse Act of 1984 under RJR Nabisco, Inc. where the defendant, who lived in Italy, see United States v. Gasperini, 894 F.3d 482, 488 n.6 (2d Cir. 2018), accessed computers located in the United States)); Garofalo, 2010 WL 11245430, at *5-6 ("[T]he CEA's provisions in this case are concerned with where the underlying options contracts were actually traded, not [the defendants'] locations at the time the trades were made.").

The Court finds that the Indictment charges Bescond with domestic violations of Section 9(a)(2).  It alleges that by causing the Bank to submit false and misleading USD LIBOR estimates that were transmitted into and published in the United States, (Indict. ¶¶ 11, 14), she affected the prices of commodities in commerce in the United States.  Initially, the Indictment alleges that the scheme "artificially reduced the USD LIBOR fix."  (Indict. ¶ 14.) The Commodities Futures Trading Commission ("CFTC") "has

_____

or the District of Columbia, and any place outside thereof."
7 U.S.C. § 1a(30)(A) (emphasis added).  A plain reading of this language supports its application to reports originating outside of but sent into the United States.  See Precise Imports Corp. v. Kelly, 218 F. Supp. 494, 496 (S.D.N.Y. 1963) (citation and internal quotation marks omitted) (interpreting statute's definition of interstate commerce--"commerce between any State, Territory, possession of the United States, or the District of Columbia, and any place outside thereof"--as "cover[ing] foreign imports" and "shipments from abroad."), aff'd, 378 F.2d 1014 (2d Cir. 1967).

repeatedly found that [USD LIBOR is] a 'commodity' within the meaning of the CEA, and that [d]efendants' false reporting of same violated Section[ ] . . . 9(a)(2) of the CEA." <u>See</u> <u>Laydon v.</u> <u>Mizuho Bank, Ltd.</u>, No. 12-CV-3419, 2014 WL 1280464, at *4 (S.D.N.Y. Mar. 28, 2014); (Société Générale CFTC Order, SP Br. Ex. B, D.E. 12-3, at 39 (emphasis added) ("Société Générale, through its U.S. Dollar LIBOR . . . submissions, knowingly delivered, or caused to be delivered, benchmark interest rate submissions that constituted false, misleading, or knowingly inaccurate reports that affected or tended to affect <u>U.S Dollar LIBOR</u>, . . . <u>a commodity in</u> <u>interstate commerce</u>.").)   Moreover, as discussed, three-month Eurodollar futures contracts are traded on the CME in Chicago, Illinois.  (Indict. ¶¶ 12, 36.)   The price of these contracts "reflected the predicted LIBOR at the end of the term of a three-month, $1,000,000 offshore deposit." (Indict. ¶ 12.)  Courts have found the offshore deposit to be the "commodity" underlying a Eurodollar futures contract.  <u>LIBOR I</u>, 935 F. Supp. 2d at 720-21; <u>see</u> <u>Laydon</u>, 2014 WL 1280464, at *4.   "[T]he price of (<u>i.e.</u>, interest on) that commodity (deposit)[ ] [ ] is none other than" USD LIBOR.  <u>See</u> <u>Laydon</u>, 2014 WL 1280464, at *4; <u>LIBOR I</u> 935 F. Supp. 2d at 720-21 ("In other words, Eurodollar contracts use LIBOR to represent the price of U.S. dollars deposited in commercial banks abroad.").   Thus, by alleging an effect on USD LIBOR, the Indictment alleges an effect on the price of commodities bought

34

and sold in the United States, as represented by Eurodollar futures contracts traded on the CME. See Laydon, 2014 WL 1280464, at *4 (concluding that the price of a Euroyen TIBOR futures contract was Euroyen TIBOR and Yen-LIBOR, and that by allegedly manipulating Yen-LIBOR and Euroyen TIBOR, defendants allegedly manipulated the price of the contract's underlying commodity, a deposit of Japanese Yen).

In sum, despite Bescond's French citizenship and residency, the Indictment charges domestic violations of Section 9(a)(2) by alleging that she caused to be transmitted into the United States false reports that affected the prices of commodities in commerce in the United States--"the objects of the statute's solicitude," Morrison, 561 U.S. at 267, 130 S. Ct. at 2884. See LIBOR I, 935 F. Supp. 2d at 697 ("Because plaintiffs' claims involve manipulation of the price of domestically traded futures contracts, they are not impermissibly extraterritorial. . . . [M]anipulating the price of futures contracts traded on domestic exchanges is precisely the conduct that the CEA was designed to regulate.").

C.   Whether the Prosecution of Bescond is Consistent with Due Process

Bescond contends that regardless of whether the Indictment accuses her of domestic or extraterritorial violations of the CEA, the Indictment runs afoul of her Fifth Amendment right

to due process because it fails to allege a "nexus" between Bescond and the United States.  (Due Process Br. at 9-13; Due Process Reply at 13-21.)  Specifically, she maintains that to be consistent with due process, the Indictment must allege that the aim of her conduct was to cause harm inside the United States or to United States citizens or interests.  Instead, the Indictment alleges that her activities were intended to help the Bank avoid reputational harm. (Due Process Br. at 9-13.)  The Government argues that since the Indictment charges domestic violations of the CEA, no "nexus" analysis is required.  (Gov't Due Process Opp. at 11-16.)

The Second Circuit has explained that courts may apply statutes extraterritorially when Congress intends them to be applied outside the United States and when doing so would be consistent with due process.  United States v. Al Kassar, 660 F.3d 108, 118 (2d Cir. 2011) (citing United States v. Yousef, 327 F.3d 56, 86 (2d Cir. 2003)).  To the latter requirement:

> "In order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair."  For non-citizens acting entirely abroad, a jurisdictional nexus exists when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests.

Id. (quoting Yousef, 327 F.3d at 111) (citations and internal quotation marks omitted).

Bescond misstates this standard in arguing that the Indictment violates due process by failing to allege that she intended to harm the United States. First, the Second Circuit's language is clear that a defendant's aim to cause harm within the United States or to its citizens or interests is sufficient, but not necessary, to establish a nexus. United States v. Yousef, No. 08-CR-1213, 2010 WL 3377499, at *4 (S.D.N.Y. Aug. 23, 2010) ("Yousef and Al Kassar's finding of a 'substantial intended effect' in or on the United States is sufficient but not necessary to justify the extraterritorial application of federal criminal law."), aff'd, 750 F.3d 254 (2d Cir. 2014); see United States v. Epskamp, 832 F.3d 154, 168 (2d Cir. 2016) (quoting United States v. Ali, 718 F.3d 929, 946 (D.C. Cir. 2013), for the proposition that "Al Kassar 'only tells us when such a nexus exists, not when it is absent.'"). Second, even if alleging such an aim were necessary in cases like Al Kassar, where non-citizen defendants who acted entirely abroad were charged with extraterritorial offenses, it would not be necessary here since Bescond is charged with domestic offenses. Thus, the failure to allege that Bescond intended to cause harm in or on the United States is not fatal to the Indictment.

That is not to say that a criminal defendant is not entitled to due process protections where an indictment charges her with a domestic crime. See Hayes, 99 F. Supp. 3d at 413-14.

37

"While it may be correct that courts typically do not engage in an analysis of a defendant's nexus with the United States where the crime charged is not extraterritorial, this may simply be a function of the nexus being obvious." Id. at 422. "[I]n a situation like this, where a criminal statute is applied domestically but the defendant claims insufficient connections with the United States, a court should evaluate whether the prosecution is fundamentally fair." Id.

As discussed, the Indictment alleges that Bescond manipulated USD LIBOR by causing the Bank to transmit false reports of USD LIBOR to the BBA via Thomson Reuters, and ultimately into the United States for publication. Those false reports are alleged to have affected the prices of commodities in commerce in the United States. Bescond is the head of Société Générale's Paris treasury desk and the supervisor of the setters who prepared the Bank's USD LIBOR submissions each business day. Considering her role in the USD LIBOR submission process, it is reasonable to infer that she knew the submissions were sent into and published in the United States and that she knew they would affect United States commodities markets. That is, it is reasonable to infer that she knew her conduct "would have a considerable effect on United States interests." See Yousef, 2010 WL 3377499, at *5. Therefore, regardless of the Indictment's allegation that she engaged in this conduct to protect the Bank's reputation, Bescond cannot show at

this stage that her prosecution by the Government is arbitrary or fundamentally unfair. See Hayes, 118 F. Supp. 3d at 628-29 ("Since [the defendant] allegedly conspired to manipulate the LIBOR using United States wires, and since [the defendant] was likely aware that this conduct would affect financial markets in the United States, his prosecution by United States authorities is not fundamentally unfair."); Yousef, 2010 WL 3377499, at *4 (citations omitted) ("In determining whether a sufficient nexus exists, courts also have considered factors such as . . . 'whether [the relevant] acts could be expected to or did produce an effect in the United States.'"); see also Hayes, 99 F. Supp. 3d at 422 (quoting Ali, 718 F.3d at 944 n.7) ("[C]ases in which even the extraterritorial application of a federal criminal statute has been 'actually deemed a due process violation' are exceedingly rare, and a defendant's burden 'is a heavy one.'").

<u>CONCLUSION</u>

For the foregoing reasons, the Court concludes that Bescond is a fugitive. Until she submits to the Court's jurisdiction, she is not entitled to challenge the Indictment or benefit from a Court order for the Government to provide discovery or additional information to support her defenses. Moreover, the Court finds that the Indictment charges domestic violations of the CEA and satisfies the Fifth Amendment's "nexus" requirement at

this stage of the proceeding.  Accordingly, Bescond's motions to dismiss (D.E. 6, 12) are DENIED.


SO ORDERED.


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:    May __29__, 2019
          Central Islip, New York